*In re* AP

Docket No. 286431. Submitted January 6, 2009, at Detroit. Decided May
    5, 2009, at 9:00 a.m.

    Holly Johnson brought a paternity action in the Wayne Circuit
Court, Family Division, against Michael Reid. The case was
assigned to Judge Arthur J. Lombard of the domestic relations
section of the family division, and Reid acknowledged that he was
the father of their child, B.J. Judge Lombard granted Johnson sole
legal and physical custody of the child. Johnson also had legal and
physical custody of another child, A.P., fathered by Gyshawn
Presberry. Following complaints of physical abuse of A.P. by
Johnson, the Department of Human Services sought temporary
wardship of both children. Preliminary, dispositional review, and
permanency planning hearings on the petition occurred before
referees assigned to the juvenile section of the family division of
the Wayne Circuit Court. During this time, Reid achieved complete
compliance with his treatment plan. Following a dispositional
hearing, B.J. was placed with Reid. Reid subsequently moved for
sole custody of B.J. Because Reid filed his motion in the juvenile
case pending before the referee rather than the paternity action
pending before Judge Lombard, the referee transferred the juve-
nile case to the docket of Judge Jerome C. Cavanagh of the juvenile
section of the family division. Following a dispositional review
hearing and a permanency planning hearing, Judge Cavanagh
dismissed the court's jurisdiction over B.J., terminated its ward-
ship over him, and awarded Reid sole physical custody and Reid
and Johnson joint legal custody of B.J. Johnson appealed.

    The Court of Appeals *held*:

    1. This case involves two separate and distinct statutory
schemes that affect the care and custody of the minor child. Courts
are bound by the Child Custody Act (CCA), MCL 722.21 *et seq.*, in
actions directly or incidentally involving the legal or physical
custody of a child. Under the CCA, the child's best interests are of
paramount importance. The juvenile code, MCL 712A.1 *et seq.*,
governs a court's involvement in the parent-child relationship
when a child's safety is threatened, such as when a parent has
abused, neglected, or abandoned the child.

2. A child's parents or other custodians must abide by the terms of a child custody order entered under the CCA. Once a court assumes jurisdiction over a child and the child becomes a ward of the court under the juvenile code, however, the juvenile court's orders supersede all previous orders, including custody orders entered by another court, even if the orders are inconsistent or contradictory. When the juvenile court dismisses its jurisdiction over the child, previous custody orders remain in full force because the court in the domestic relations matter never relinquished its jurisdiction over the custody dispute, nor was it required to do so for the juvenile court to exercise its jurisdiction under a distinct statutory scheme that takes precedence over the CCA.

3. Under MCL 600.1023, when two or more matters within the jurisdiction of the family division of the circuit court that involve members of the same family are pending in the same judicial circuit, the matters are to be assigned whenever practicable to the judge to whom the first matter was assigned. Under MCL 600.1021, a family division judge presiding over a matter under the juvenile code has the same jurisdiction and authority as a family division judge presiding over a domestic relations matter, including the power and authority to hear actions under the CCA. Family division judges must abide by the procedural requirements of the appropriate statute, however, when hearing a custody matter under the CCA or conducting proceedings under the juvenile code. The court must make clear that it is exercising jurisdiction pursuant to article 10 of the Revised Judicature Act, MCL 600.1001 *et seq.*, and the court's exercise of jurisdiction must be consistent with relevant local court rules, such as the Wayne Circuit Court rules establishing juvenile and domestic relations sections of its family division.

4. While Judge Cavanagh was presiding over a proceeding under the juvenile code, he had not yet dismissed the court's jurisdiction over B.J. before he heard Reid's custody motion. It is clear that his determination to grant Reid custody was based on the CCA, not the juvenile code. Both the custody motion and the child protective action were properly before Judge Cavanagh. Judge Cavanagh erred, however, by failing to require that the custody motion be captioned with the appropriate paternity case name and number and then proceeding to decide the motion under the juvenile case number and entering it in a supplemental order involving matters under the juvenile code.

5. Judge Cavanagh erred by failing to consider the best-interest factors of MCL 722.23 before changing custody. Under the CCA, the court may, in the best interests of the child, modify a

custody order for proper cause shown or because of a change of circumstances. The party seeking the custody change must establish this by a preponderance of the evidence. In a dispute between parents, a presumption exists in favor of the established custodial environment. If the court determines that an established custodial environment exists with one parent and not the other, the non-custodial parent has the burden of persuasion to show by clear and convincing evidence that a change in the custodial environment is in the child's best interests. The court must then determine whether a change in the established custodial environment is in the child's best interests by considering the best-interest factors. Judge Cavanagh conclusorily changed custody without making any of the requisite findings. Reid had established that a change of circumstances had occurred since the entry of the custody order by Judge Lombard, and an established custodial environment with Reid existed. Johnson was thus required to show by clear and convincing evidence that a change in the established custodial environment was in the child's best interests. Because Judge Cavanagh failed to make any finding concerning the best-interest factors, appellate review of whether the court's ultimate determination was against the great weight of the evidence is impossible. There must be some indicia on the record showing that the court satisfied itself that its determination was in the child's best interests, both to preserve an adequate record for appellate review and to protect the fundamental rights of the parties to make decisions regarding the care, custody, and control of their children in the absence of a compelling state interest justifying governmental interference. This matter must be remanded for a new evidentiary hearing and articulation of factual findings consistent with the CCA.

Remanded.

1. COURTS — FAMILY DIVISION OF CIRCUIT COURT — JURISDICTION OF FAMILY DIVISION — JUVENILE PROCEEDINGS — DOMESTIC RELATIONS MATTERS.

A family division judge presiding over a matter under the juvenile code, MCL 712A.1 *et seq.*, has the power and authority to hear related domestic relations actions; a court presiding over a juvenile proceeding that faces a matter that has been consolidated with a related domestic relations matter, or a court presiding over a domestic relations proceeding, that faces a matter that has been consolidated with a juvenile matter, must make it clear that it is exercising jurisdiction under chapter 10 of the Revised Judicature Act, and the court's exercise of jurisdiction must further be consistent with relevant local court rules; the court must abide by

the procedural requirements of the particular statute under which it is proceeding (MCL 600.1021, 600.1023).

2. PARENT AND CHILD — CHILD CUSTODY — ESTABLISHED CUSTODIAL ENVIRONMENT — CHANGES IN CUSTODIAL ENVIRONMENT — BEST-INTEREST FACTORS.

The family division of the circuit court may modify, in the best interests of the child, previous custody orders for proper cause shown or because of a change in circumstances; the party seeking a change of custody must establish by a preponderance of the evidence that proper cause or a change in circumstances exists; when the custody dispute is between parents, there is a presumption in favor of the established custodial environment; if an established custodial environment exists with one parent and not the other, the noncustodial parent has the burden of persuasion to show by clear and convincing evidence that a change in the custodial environment is in the child's best interests; if an established custodial environment exists with both parents, the party seeking to modify the custody arrangement bears the burden of rebutting the presumption in favor of the custodial environment established with the other parent; the court must consider the statutory best-interest factors and determine whether a change in the established custodial environment is in the child's best interests (MCL 722.23, 722.27[1][c]).

*Michael A. Cox*, Attorney General, *B. Eric Restuccia*, Solicitor General, *Rebekah Mason Visconti*, Division Chief, and *Tonya C. Jeter*, Assistant Attorney General, for the Department of Human Services.

*Edward J. Joseph* for Holly Johnson.

*Anita G. McIntyre P.C.* (by *Anita G. McIntyre*) for the minor child.

Before: MURPHY, P.J., and K. F. KELLY and DONOFRIO, JJ.

K. F. KELLY, J. In this child protective action initiated by the Department of Human Services (DHS or petitioner), respondent-mother, Holly Johnson, appeals as of right the "custody" order entered by Wayne Circuit

Court Judge Jerome C. Cavanagh, assigned to the juvenile section of the family division of the court,[1] awarding the father, Michael Reid, joint legal custody and sole physical custody of the minor child, B.J. Sole legal and physical custody of the minor child had previously been awarded to Johnson by an earlier order entered in an active paternity action between Johnson and Reid pending before Wayne Circuit Court Judge Arthur J. Lombard, assigned to the domestic relations section of the family division.[2]

The issue raised on appeal requires us to consider whether a trial court presiding over a child protective proceeding, or juvenile case, may make determinations in related actions under the Child Custody Act (CCA). We hold that a trial court that is part of a circuit court's family division under MCL 600.1011 presiding over a juvenile case has jurisdiction to address related actions under the CCA consistent with MCL 600.1021 and MCL 600.1023, as well as local court rules. We further hold that when exercising its jurisdiction, a trial court must abide by the relevant procedural and substantive requirements of the CCA. Accordingly, we vacate the trial court's "custody" order entered in the child protective proceedings and remand for further proceedings.

### I. FACTS AND PROCEDURAL BACKGROUND

Reid and Johnson had a child out of wedlock, B.J., who was born on March 3, 2004. When Reid discovered Johnson was pregnant with B.J., Johnson and Reid

---

[1] Child protective proceedings pending before the Wayne Circuit Court are heard in the Lincoln Hall of Justice, located in the city of Detroit.

[2] Domestic relations matters pending before the Wayne Circuit Court are heard in the Coleman A. Young Municipal Center in the city of Detroit.

separated. Reid saw B.J. on only one occasion, for approximately 20 minutes, shortly after B.J.'s birth.

In October 2004, a paternity action was initiated in the Wayne Circuit Court, *Johnson v Reid*, Docket Number 2004-462722-DP. This paternity action was assigned to Judge Lombard. Reid admitted that he is B.J.'s father and signed an affidavit acknowledging paternity.[3] Judge Lombard entered a judgment of support and filiation granting Johnson sole legal and physical custody of B.J. Reid was not granted any parenting time but was ordered to pay child support and other related expenses.

Johnson also has another child, A.P., born on March 14, 1993, from a previous marriage to Gyshawn Presberry. Johnson and Presberry divorced in 1997. The judgment of divorce awarded Johnson legal and physical custody of A.P., permitted Presberry supervised parenting time, and required Presberry to pay child support. Presberry, however, failed to pay child support and at the time of these events had several warrants for his arrest because of his child support arrearage.

#### A. CHILD PROTECTIVE SERVICES PETITION AND TRIAL

In April 2006, the DHS received a complaint that Johnson was physically abusing A.P. A.P. allegedly had welts and her arms were bleeding. A.P. admitted that her mother frequently beat her. Johnson, however, evaded DHS involvement by sending A.P. to Tennessee.

---

[3] MCL 722.1003(1) provides: "If a child is born out of wedlock, a man is considered to be the natural father of that child if the man joins with the mother of the child and acknowledges that child as his child by completing a form that is an acknowledgment of parentage." The acknowledgement "establishes paternity, and . . . may be the basis for court ordered child support, custody, or parenting time . . . ." MCL 722.1004.

In December 2006, after A.P. had returned to Michigan, another complaint was filed against Johnson. The DHS sought temporary wardship of both A.P. and B.J. in the case currently on appeal. In the initial petition, it was alleged that Johnson had beaten A.P. and had also allegedly left A.P., who was 12 or 13 years old at the time, to care for B.J. while Johnson was gone from 4 p.m. to midnight. The petition noted that neither of the children's fathers sought custody of the children, sought to visit them, or provided assistance for the children's care. As a result, the children were removed from Johnson's care on December 5, 2006, and placed with relatives.[4]

A preliminary hearing on the petition was held on December 6, 2006, Referee Leslie Graves[5] presiding, during which the DHS indicated that it was unsafe to keep the children in Johnson's home. The court authorized the petition, continued the children's placement with relatives, and granted Johnson supervised parenting time at the agency. The matter was set for a pretrial hearing before Referee David Perkins,[6] which was held on January 16, 2007. A.P.'s father did not attend the pretrial hearing. B.J.'s father, Reid, however, did attend this hearing and was granted supervised parenting time at the agency.

Trial began before Referee Perkins on March 22, 2007, and continued on April 20, 2007, and June 1, 2007. A.P. testified that the allegations of physical abuse were false and that although her mother threatened to

---

[4] A.P. was placed with her maternal grandparents, while B.J. was placed with his maternal uncle.

[5] Referee Graves is assigned to the juvenile section of the Wayne Circuit Court's family division.

[6] Referee Perkins is assigned to the juvenile section of the Wayne Circuit Court's family division.

whip her for misbehaving, Johnson never did. According to A.P., her father made false reports of child abuse in retaliation against Johnson for not permitting him to see A.P. A.P. further indicated that allegations that her mother had hit her with a vacuum cleaner cord, a belt, and a coat hanger and had left her alone with B.J. were false, but admitted making these accusations to a protective services worker. Nonetheless, A.P. testified that her mother "whooped" her "[l]ike how other kids get whippings" and further admitted that her mother whipped her with a belt sometime around Thanksgiving 2006. A.P. also testified that Johnson, on one occasion, had ordered her to strip down to her underwear and to lie down with her arms and legs outstretched while Johnson hit her on the thighs with a belt.

Johnson's mother, Judith Johnson, testified that she saw Johnson hit A.P. on two or three occasions and that she thought Johnson was hitting A.P. too hard. She also saw bruises on A.P.'s thighs that appeared to be "from some kind of cord . . . ." Johnson's sister, Kristi Johnson, testified that A.P. had told her that Johnson whipped her on numerous occasions using a vacuum cleaner cord, an extension cord, or a belt and that Johnson had left A.P. alone with her brother until midnight.

Reid, who had lived with Johnson for three months, testified that he had also witnessed Johnson whip A.P. "uncontrollably" with a coat hanger and had also seen Johnson beat A.P. with her hand and a belt. In addition, Reid admitted to having broken Johnson's keyboard when Reid and Johnson separated because Johnson had allegedly tried to prevent him from leaving the apartment. As a result of this incident, Reid had pleaded guilty of malicious destruction of property and was ordered to pay restitution. Reid denied having any

other convictions, although the DHS had documentation of prior convictions for domestic violence and carrying a concealed weapon. He admitted that he had a child support arrearage for B.J., and for three other children from other relationships as well, and that he had "dealt with the warrants for the child support." Reid testified that he had not seen B.J. because Johnson had prevented him from seeing his son. Johnson acknowledged that she wrote to Reid in 2005, after B.J.'s birth, and told him that she did not want him to have anything to do with B.J. Reid indicated that he was self-employed as a handyman and that he had part-time jobs delivering flowers and pizza. A.P.'s father did not attend the proceedings. At the end of the trial, the court assumed temporary jurisdiction over the children, ordered that a parent-agency agreement be prepared, ordered that psychological and psychiatric evaluations of Johnson, Presberry, and Reid be performed, and recommended counseling.

### B. JULY 2007 DISPOSITIONAL REVIEW HEARING

Subsequently, at the dispositional hearing on July 27, 2007,[7] the parties entered into a parent-agency agreement that included, among other requirements, obtaining suitable housing, individual and family counseling, obtaining a legal source of income, and attending parent education classes. Referee Perkins also ordered Johnson to undergo anger management and domestic violence counseling. Reid was permitted unsupervised parenting time, including overnights and weekends,

---

[7] By the time of this dispositional hearing, A.P. was no longer staying with relatives but had been placed in a juvenile detention center as a result of pending criminal charges. These charges were eventually dismissed, and A.P. then began residing with her maternal grandparents again.

while Johnson's supervised parenting time at the agency was reinstated.[8] Between the trial and this dispositional hearing, Reid had not missed a single visit with his son.

### C. OCTOBER 2007 PERMANENCY PLANNING HEARING

On October 24, 2007, a permanency planning hearing was held. The foster care worker assigned to the case, Khaleelah Dawson, testified that Reid was in full compliance with the parenting time schedule, had completed a psychological evaluation, and had recently been assigned an individual counselor but had not yet started counseling. Dawson reported that his unsupervised weekend visits with B.J. had been going well and that B.J. had indicated to her that he would like to stay with Reid. Dawson also indicated that B.J. "[got] along well" with Reid's other two children, who visited during the weekends and over the summer. Reid lived alone in his own home, and Dawson indicated that the previous caseworker had been out to the house and found it appropriate. Dawson recommended that B.J. be placed with Reid with in-home services specifically directed at social and educational resources on parenting.

With respect to Johnson, Dawson testified that Johnson was attending individual counseling. Dawson, however, commented that Johnson continued to deny any type of physical abuse and thus recommended individual psychotherapy. Dawson reported that Johnson had attended the domestic violence and substance abuse assessments, as well as parenting classes, but had failed to take any of the random drug screens

---

[8] It had been discovered that Johnson did not visit B.J. according to the court's orders and allegedly saw B.J. every Sunday without supervision. As a result of her actions, Johnson's visitation with B.J. had been suspended as of the date of this dispositional hearing.

ordered. Johnson had not yet completed a psychiatric evaluation. Further, although Johnson was permitted weekly supervised visitation at the agency, she had only visited twice since the previous dispositional hearing in July 2007. Dawson testified that Johnson had insisted on weekend visits, which were not available at the agency, and that Johnson had not made arrangements to visit during the week despite the agency's efforts to make accommodations. Johnson had informed Dawson that she worked during the day and would not be able to make nighttime visits during the week. Nonetheless, Johnson had failed to submit to Dawson a work schedule or pay stubs, despite Dawson's repeated requests, and Dawson had not been able to verify Johnson's employment. Dawson also indicated that Johnson lacked stable housing because she had moved twice in the previous 90 days. At the end of the hearing, the referee ordered that the children remain temporary wards of the court and continued the previous orders, including one requiring psychotherapy for Johnson.

### D. JANUARY 2008 DISPOSITIONAL REVIEW HEARING

A dispositional review hearing followed on January 10, 2008. Dawson testified that Johnson was in partial compliance with her treatment plan. Johnson had started attending supervised visits with the children on a regular basis, participated in a clinic for "child study," and completed the psychological evaluation. However, Dawson had not yet received the results of the psychiatric evaluation, and Johnson had remained reluctant to accept responsibility for the physical abuse, although her therapist reported that she was beginning to accept responsibility. Johnson had also failed to complete the random drug screens, but Dawson did not believe Johnson was using any illicit substances. Dawson

agreed to omit the drug screen requirement unless Johnson showed signs of drug use. Dawson recommended that Johnson be allowed to have some unsupervised day visits, at Dawson's discretion, contingent upon continued compliance with the court's orders. Dawson noted that Johnson did not have suitable housing and that she had referred Johnson to housing assistance. The court report Dawson submitted indicated that during visitation Dawson had to "redirect" Johnson on two separate occasions when Johnson spoke negatively about the children's respective fathers in the children's presence and acted hostilely toward her own parents after parenting time had ended.

Dawson further testified that Reid was in complete compliance with the treatment plan and had done everything the court had asked of him. Reid had actively participated in therapy, and his weekend-long unsupervised visits continued to go well. Dawson had also visited Reid's home and reported that it was suitable. Dawson recommended that B.J. be placed with Reid once in-home services and a suitable day-care plan were in place. Reid had already begun arranging day-care plans with family members.

At the end of this hearing, the court ordered petitioner to place B.J. with Reid because it determined that it was unnecessary to wait for in-home services to begin.[9] The court acknowledged that Reid intended to move for a change of custody of B.J., but explained that custody is a separate issue and that its order for placement did not substitute for, or obviate the need to file, a motion for change of custody. The court also

---

[9] If a court determines that the "return of the child to his or her parent would not cause a substantial risk of harm to the child's life, physical health, or mental well-being, the court shall order the child be returned to his or her parent." MCL 712A.19a(5).

adopted Dawson's recommendation that Johnson be given unsupervised day visits with her children at Dawson's discretion. The children continued to be wards of the court.

### E. MAY 2008 MOTION FOR CUSTODY

Subsequently, Reid moved for sole custody of B.J. However, the motion for change of custody was not filed in the paternity action before Judge Lombard, in which the original custody order had been entered, but was filed in the juvenile case pending before Referee Perkins.[10] It was noticed to be heard on May 12, 2008, the same day as the next dispositional review hearing and permanency planning hearing. Because of the change of custody motion, Referee Perkins transferred the case to the docket of Judge Cavanagh.[11]

At the outset of the hearing, petitioner asked the court to address the change of custody motion before conducting the dispositional hearing, and the court agreed. Reid argued that he was entitled to custody because he had completely complied with the treatment plan. Johnson objected to the motion for custody generally and to an award of sole legal custody specifically. Johnson also sought custody of B.J. While she argued that she had made progress on her treatment plan and had had trouble with petitioner's caseworker, she failed to articulate a specific objection to a change of physical custody. The attorney appointed for the child argued

---

[10] The motion was captioned with the case name and docket number of the child protective proceedings. Further, it is unclear from the lower court record whether Reid was asking for joint legal custody or sole legal custody. Reid's motion simply sought "sole custody" of the child.

[11] Wayne Circuit Court family division referees assigned to the juvenile section do not hear custody motions, but it is unclear from the record if that is because of a specific prohibition or simply local practice.

that Johnson should not be given custody as she had concerns that B.J. would be at risk if placed in Johnson's home because Johnson had physically abused A.P. and directed the court's attention to the exhaustive material in both the legal and confidential file.[12] The child's attorney did not object to Reid's obtaining sole physical custody of B.J., with joint legal custody for both parents. Petitioner's attorney stated that the DHS was "not really a party to this case" and did not object to the motion for custody going forward.

After hearing the parties' arguments, the trial court stated: "Okay. After considering the motion the Court's going to grant joint legal custody to mother and father and sole physical custody to Mr. Reid . . . ." Before proceeding with the juvenile case, the court indicated that it would consider Johnson's testimony with regard to the motion for custody.

The court then conducted the dispositional review and permanency planning hearings. At the outset, the trial court admitted evidence petitioner presented, including extensive documentation of the parties' psychological evaluations and related reports prepared by the DHS. During the hearing Dawson testified that Reid had completed his treatment plan, that she could offer him no other services, and that she had no objections to B.J.'s staying in Reid's home. Dawson believed that it was in B.J.'s best interests to be in Reid's physical custody and that upon entry of a custody order, the trial court should dismiss its jurisdiction over B.J.

Dawson also testified that Johnson's individual therapy had been terminated because of lack of atten-

---

[12] In child protection actions, the legal file is a record of all the court proceedings, while the confidential file contains information concerning the parents' treatment plans and related documentation. The confidential file is not available to the general public.

dance. Dawson indicated that Johnson still did not believe that she had done anything wrong and "blame[d] others for her problems." According to Dawson, Johnson's therapist wanted Johnson to re-enroll for more therapy to work on this problem. Johnson's visitation had also reverted to supervised visits at the agency because Johnson had failed to return B.J. to the agency after an unsupervised Saturday visit and kept him for an entire weekend. Dawson recommended that the current order with respect to Johnson's visitation rights, which included unsupervised visitation at Dawson's discretion, be continued. Dawson testified that she was unable to verify Johnson's housing or employment. Initially, Johnson had told Dawson that she was living with a friend but did not want Dawson to come out and view the home because she would not be living there with her children. Dawson did not conduct a home assessment and was informed on the day of the hearing that Johnson had allegedly found a new home.

As part of this hearing, Dawson's May 8, 2008, court report was admitted into evidence. The report indicated that Johnson had completed the parenting classes and domestic violence classes. The report also noted that Johnson's individual therapy had been terminated as of May 6, 2008, because Johnson's last session had been scheduled for March 8, 2008, and the therapist's attempts to re-engage Johnson had failed. The report further stated that Johnson had written numerous complaints to petitioner indicating that "she was innocent of all allegations and that she was the victim." Dawson indicated in the report that Johnson had been unavailable to plan for reunification. Dawson's attempts to speak with Johnson had been unsuccessful because when Dawson attempted to communicate with Johnson, Johnson would state that someone else was servicing her case. Dawson testified that she and

Johnson had experienced a "communication barrier" and that, as a result of Johnson's complaints, the case was about to be transferred to a different foster care worker.

Johnson testified that she had completed parenting classes and that she had completed therapy. According to Johnson, neither her therapist nor Dawson had told her she needed to continue therapy, but she testified that she would continue to attend sessions. Johnson also testified that she had notified the agency that she had new housing, but had not notified Dawson because there was always a "tussle/tussle" when she tried to talk to Dawson. Johnson admitted that she had filed three other complaints against different DHS employees.

After hearing this testimony, the court stated:

> The Court's jurisdiction over [B.J.] is dismissed. Wardship's terminated. The Court finds reasonable efforts have been made to preserve and unify the family. Progress towards that goal and the goal of reunification have been made.[13]

The trial court continued Johnson's parenting classes and individual therapy sessions. Subsequently, the trial court entered a single order under the juvenile case number dismissing the court's jurisdiction over B.J., terminating its wardship over him, and awarding Reid sole physical custody and Reid and Johnson joint legal custody of B.J. This appeal followed.[14]

### II. STANDARDS OF REVIEW

Three standards of review are relevant to our review of a trial court's decision on a motion for change of

---

[13] The trial court continued its wardship of A.P.

[14] Reid, a respondent below, is not involved in this appeal.

custody. The trial court's factual findings are reviewed under the great weight of the evidence standard. *McIntosh v McIntosh*, 282 Mich App 471, 474 ; 768 NW2d 325 (2009). The court's factual findings are against the great weight of the evidence if the evidence clearly preponderates in the opposite direction. *Berger v Berger*, 277 Mich App 700, 705; 747 NW2d 336 (2008). We review for an abuse of discretion the trial court's discretionary decisions, such as the award of custody. *Id.* Questions of law in custody matters are reviewed for clear legal error. *Phillips v Jordan*, 241 Mich App 17, 20; 641 NW2d 183 (2000). Clear legal error exists when the trial court incorrectly chooses, interprets, or applies the law. *Foskett v Foskett*, 247 Mich App 1, 4-5; 634 NW2d 363 (2001). Further, whether the circuit court has jurisdiction over both child protection actions and domestic relations matters is a question of law we review de novo. See *Berger*, 277 Mich App at 702.

### III. APPLICABLE LAW

Johnson argues that the trial court erred by failing to consider the best interests factors enumerated in the CCA when it awarded custody of the minor child to Reid. Conversely, petitioner and the attorney for the child characterize the trial court's decision as a determination under the juvenile code, meaning that no analysis of the best interests factors was appropriate or even required. While we agree that the trial court erred in the manner in which it entered the "custody" order, we find it necessary to first consider the applicable law governing this case.

### A. FAMILY LAW'S CONSTITUTIONAL DIMENSION

In this case, there are two distinct and separate statutory schemes affecting the care and custody of the

minor child: the juvenile code and the CCA. Relevant to each of these statutory schemes are the relative interests of the state, the parents, and the child in the child's upbringing. Generally, the state has no interest in the care, custody, and control of the child and has no business interfering in the parent-child relationship. See *Ryan v Ryan*, 260 Mich App 315, 333; 677 NW2d 899 (2004). As a practical matter, the state is not equipped to supply a child with the necessary care and direction that a parent is equipped to provide. Neither is it its place to do so, as due process precludes a government from interfering with parents' fundamental liberty interest in making decisions regarding the care, custody, and control of their children absent a compelling state interest. *Troxel v Granville*, 530 US 57, 65-66, 120 S Ct 2054; 147 L Ed 2d 49 (2000); *DeRose v DeRose*, 469 Mich 320, 328-329; 666 NW2d 636 (2003); *Herbstman v Shiftan*, 363 Mich 64, 67-68; 108 NW2d 869 (1961); *Ryan*, 260 Mich App at 333-334. Rather, it is the parent's duty, and fundamental right, to do what the state cannot—direct a child's upbringing and education and prepare that child for future obligations. *Troxel*, 530 US at 65-66. Similarly, a child also has a due process liberty interest in his or her family life, *In re Clausen*, 442 Mich 648, 686; 502 NW2d 649 (1993), which includes having a fit parent, *In re Anjoski*, 283 Mich App 41, 60-61; 770 NW2d 1 (2009); *Herbstman*, 363 Mich at 67-68. In other words, a child has a " 'right to proper and necessary support; education as required by law; medical, surgical, and other care necessary for his health, morals, or well-being . . . .' " *Ryan*, 260 Mich App at 333-334, quoting *Herbstman*, 363 Mich at 67. Thus, when a parent is fit and a child's needs are met, there is no reason for the state to interfere in a child's life.

B. THE CHILD CUSTODY ACT AND THE JUVENILE CODE

The state, however, may become involved in a child's upbringing under certain limited circumstances when a child's welfare is affected. *Ryan*, 260 Mich App at 333. Under domestic relations law, for example, certain actions implicate the state's interest in the child's welfare. These include actions for child support, *LME v ARS*, 261 Mich App 273; 680 NW2d 902 (2004), paternity actions, *Sinicropi v Mazurek*, 273 Mich App 149; 729 NW2d 256 (2006), and dissolution of marriage, *Harvey v Harvey*, 470 Mich 186; 680 NW2d 835 (2004). If any of these actions directly or incidentally involve the legal or physical custody of a child, the courts are bound by the CCA in determining who should have physical and legal custody of a child. See *Sirovey v Campbell*, 223 Mich App 59, 68; 565 NW2d 857 (1997). In making this determination, the child's best interests are of paramount importance, and the goal is to resolve a custody dispute in a way that promotes the child's best interests and welfare. *Harvey*, 470 Mich at 192-193. Once a court enters a custody order, it cannot change the award of custody without overcoming certain procedural safeguards. See, e.g., MCL 722.25(1); MCL 722.27. These safeguards are in place for the stability of the child and are meant to protect against unwarranted and disruptive changes of custody. *Corporan v Henton*, 282 Mich App 599, 603; 766 NW2d 903 (2009); *Vodvarka v Grasmeyer*, 259 Mich App 499, 509; 675 NW2d 847 (2003).

Similarly, the state may become involved in the parent-child relationship when a child's safety is threatened, for example, if the parent has abused or neglected the child or has abandoned the child. The state's involvement under these types of circumstances is governed by the juvenile code, MCL 712A.1 *et seq*. A

court presiding in juvenile proceedings obtains jurisdiction over the matter once a petition is filed and the court has authorized the petition after conducting a preliminary inquiry. MCL 712A.2; MCL 712A.11(1); see *In re Jagers*, 224 Mich App 359, 361; 568 NW2d 837 (1997). Although the court has jurisdiction over the matter, the child will not come under the court's jurisdiction and become a ward of the court until the court holds an adjudication on the merits of the allegations in the petition and finds by a preponderance of evidence that there is factual support for permitting judicial intervention. *In re AMB*, 248 Mich App 144, 176-177; 640 NW2d 262 (2001). Subsequently, the court can hold dispositional review hearings and permanency planning hearings and enter orders governing the child's care and custody. *Id.* at 177; MCL 712A.18f(4). The goal of these proceedings is always reunification of the family unit. See *In re B & J*, 279 Mich App 12, 18; 756 NW2d 234 (2008).

However, a conflict may arise concerning the care and custody of a child, as in this case, where domestic relations law and juvenile law intersect. See *In re Brown*, 171 Mich App 674; 430 NW2d 746 (1988). Obviously, upon entry of a child custody order under the CCA, a child's parents, or other custodians, must abide by the terms of the custody order. However, once a juvenile court assumes jurisdiction over a child and the child becomes a ward of the court under the juvenile code, the juvenile court's orders supersede all previous orders, including custody orders entered by another court, even if inconsistent or contradictory. MCR 3.205(C); see *Krajeweski v Krajewski*, 420 Mich 729, 734-735; 362 NW2d 230 (1984). In other words, the previous custody orders affecting the minor become dormant, in a metaphoric sense, during the pendency of the juvenile proceedings, but when the juvenile court

dismisses its jurisdiction over the child, all those previous custody orders continue to remain in full force and effect. This is necessarily the result because the prior domestic relations court never relinquished its jurisdiction over the custody dispute, as the CCA vests a court with continuing jurisdiction over the matter, *Harvey*, 470 Mich at 192, nor was the prior court required to relinquish or waive its jurisdiction in order for the juvenile court to exercise its jurisdiction, *Krajewski*, 420 Mich at 734-735; MCR 3.205(A). In addition, the juvenile court's orders function to supersede, rather than modify or terminate, the custody orders while the juvenile matter is pending because the juvenile orders are entered pursuant to a distinct statutory scheme that takes precedence over the CCA. See *Krajewski*, 420 Mich at 734-735. We note that during the duration of the juvenile proceedings, while the parties subject to the custody order can move to modify the custody order,[15] any modification would remain superseded by the juvenile court's orders.

### C. 1996 PA 388: "FAMILY COURT PLANS"

Until very recently, only Michigan's probate courts had original jurisdiction over all juvenile cases. Const 1963, art 6, § 15, grants probate courts "original jurisdiction in all cases of juvenile delinquents and dependents, except as otherwise provided by law." However, 1996 PA 388, amending the Revised Judicature Act (RJA)[16] by adding chapter 10, reorganized Michigan's court system by creating a family division within the

---

[15] The DHS is currently required to provide noncustodial parents of children suspected of being abused or neglected with forms on "how to change a custody order" after determining there is an open "friend of court case" concerning the children. MCL 722.628(21).

[16] 1961 PA 236, MCL 600.101 *et seq.*

circuit court, which assumed much of the jurisdiction over juvenile cases formerly given to the probate courts. MCL 600.1001; MCL 600.1003; MCL 600.1021; see *In re AMB*, 248 Mich App at 167. It required each judicial circuit to develop a "family court plan" under which the family division of each circuit has "sole and exclusive jurisdiction" over, but not limited to, actions under the CCA, child protective actions, and paternity actions. MCL 600.1011; MCL 600.1021. This reorganization, and the mandate that each judicial circuit create a family court plan tailored to its community's needs, is intended to "promote more efficient and effective services to families . . . ." MCL 600.1011(1). As part of this goal, 1996 PA 388 added a provision intended to better serve families who face multiple matters before different judges and encompasses the concept of "one judge, one family." See Saoud Hallmark, *The new family division in Michigan*, 76 Mich B J 956, 958 (1997).[17] MCL 600.1023 provides:

> When 2 or more matters within the jurisdiction of the family division of circuit court involving members of the same family are pending in the same judicial circuit, those matters, whenever practicable, shall be assigned to the judge to whom the first such case was assigned.

And the act specifically gives a judge presiding over a juvenile matter the "power and authority" to hear actions under the CCA. MCL 600.1021(3). Nonetheless, family division judges must still abide by the procedural requirements incumbent upon them when hearing a custody matter under the CCA or conducting proceedings under the juvenile code. See MCR 3.205.

The Wayne Circuit Court developed a family court plan that divided its family division into a juvenile

---

[17] Linda Saoud Hallmark is now a judge of the Oakland County Probate Court assigned to the family division of the Oakland Circuit Court.

section and a domestic relations section, each of which is assigned particular causes of action in part because the geographical distance between the Lincoln Hall of Justice (where child protective proceedings are heard) and the Coleman A. Young Municipal Building (where domestic relations matters are heard.) Wayne Circuit Court Administrative Order No. 1997-04; Wayne Circuit Court Administrative Order No. 1997-05. For example, the juvenile section is assigned delinquency and abuse and neglect cases, whereas the domestic relations section is assigned cases pertaining to divorce, paternity, support, custody, and emancipation of minors. Each section, however, has the same authority and jurisdiction as the other section over matters enumerated in MCL 600.1021.

The Wayne Circuit Court has also developed its own procedures to better serve families who face multiple matters before different judges within its family division consistent with MCL 600.1023: When a domestic relations dispute arises and a juvenile action involving the same parties is already pending, or vice versa, one judge may resolve both matters if the judges on the respective dockets confer and deem it appropriate. See AO 1997-04; AO 1997-05.

### IV. ANALYSIS

#### A. JURISDICTION AND AUTHORITY

Petitioner and the child's attorney mischaracterize the trial court's decision to award "custody" to Reid as a determination made under MCL 712A.19(1) of the juvenile code and MCR 3.976. According to petitioner and the child's attorney, the trial court was not required to consider the best interests factors delineated in the CCA, as Johnson contends, because the court was

acting under the juvenile code. The attorney for the child further argues that the posture of the case was such that the trial court was precluded from making a custody determination under the CCA because Johnson was incapable of taking custody and application of the factors would be "premature." We disagree.

MCL 712A.19(1) provides, in relevant part:

> Subject to [MCL 712A.20] if a child remains under the court's jurisdiction, a cause may be terminated or an order may be amended or supplemented, within the authority granted to the court in [MCL 712A.18] at any time as the court considers necessary and proper. An amended or supplemented order shall be referred to as a "supplemental order of disposition".

In other words, when a parent has successfully completed his or her treatment plan, and has otherwise become a fit parent, it is appropriate for the court to terminate its jurisdiction over the child. Similarly, MCR 3.976 provides courts with guidance regarding a child's return to a parent in proceedings under the juvenile code and states:

> (A) Permanency Plan. At or before each permanency planning hearing, the court must determine whether the agency has made reasonable efforts to finalize the permanency plan. At the hearing, the court must review the permanency plan for a child in foster care. The court must determine whether and, if applicable, when:
>
> (1) the child may be returned to the parent, guardian, or legal custodian[.]
>
> * * *
>
> (E) Determinations; Permanency Options.
>
> (1) Determining Whether to Return Child Home. At the conclusion of a permanency planning hearing, the court must order the child returned home unless it determines

that the return would cause a substantial risk of harm to the life, the physical health, or the mental well-being of the child.

While it is true that Reid was granted "custody" of the minor child in an order captioned as a juvenile court order and entered during a juvenile proceeding, petitioner and the children's attorney are incorrect to characterize the trial court's determination as based on either of these provisions. Rather, Reid specifically filed a motion for a change of custody, requesting that he have sole custody of B.J. When the trial court granted the motion, it had not yet dismissed its jurisdiction over the minor child pursuant to MCL 712A.19(1), nor had it conducted the permanency planning hearing, as MCR 3.976 requires. Further, had the trial court dismissed its jurisdiction over the minor child under MCL 712A.19(1) before it considered Reid's motion for custody, the minor child would have necessarily been returned to Johnson because the previous custody order from the paternity action granted Johnson sole legal and sole physical custody. MCR 3.205(C). The minor child, however, was permitted to remain in Reid's care. Given these facts and the court's explicit statement that it had considered the change of custody motion and decided to grant Reid joint legal and sole physical custody of the minor child, it is unequivocal that the court's determination was based on the CCA and not the juvenile code.

Although the trial court erred in the *manner* in which it conducted the change of custody hearing, as discussed later, we find nothing inherently wrong with the court's exercising its discretion to consider the merits of the motion. There is no authority to preclude a circuit judge from determining custody pursuant to the CCA ancillary to making determinations under the juvenile code, and neither petitioner nor the child's

attorney has identified any such authority. To the contrary, the RJA, as amended by 1996 PA 388, specifically permits a judge presiding over a juvenile matter to consider related actions under the CCA. Judge Cavanagh, a circuit judge, was acting as a juvenile section judge. Pending before the court were three matters involving the same family: a motion for change of custody, a dispositional review hearing, and a permanency planning hearing. Because the juvenile section has the same authority and jurisdiction as the domestic relations section, MCL 600.1021, we conclude that Reid's motion for custody, as well as the accompanying child protective action, were properly before the court.[18]

We stress, however, that when a family division court deems it appropriate to consolidate numerous matters concerning the same family that fall within the jurisdiction of the family division under MCL 600.1021 but may have originally been assigned to different judges, it is necessary that family division courts follow the procedural requirements incumbent upon them. Here the trial court failed to require that the motion be captioned with the appropriate paternity case name and number and, instead, proceeded to decide the motion for custody under the juvenile case number. And the resultant custody order that the court entered was entered in the same supplemental juvenile order rather than in the paternity action. This was error.

---

[18] There is no indication on the record showing that the procedures of AO 1997-04, AO 1997-05, and MCL 600.1023 were not followed, and the parties do not contest whether these procedures were followed. And, while MCL 600.1023 would indicate that the original judge who heard the paternity action in 2004 should be assigned to the case, the lengthy juvenile proceedings and the geographical separation of the juvenile and domestic relations sections of the Wayne Circuit Court would make it impracticable to assign the matter to Judge Lombard's docket in light of Judge Cavanagh's comparatively heightened familiarity with the current proceedings.

### B. CUSTODY AWARD

Turning to the substance of Johnson's argument, we also agree that the trial court erred by failing to consider the best interests factors before changing custody.

### 1. THRESHOLD FINDING AND BURDEN OF PERSUASION

Under the CCA, if a child custody dispute has arisen, the circuit court may, in the best interests of the child, modify its previous orders or judgments "for proper cause shown or because of change of circumstances . . . ." MCL 722.27(1)(c). Thus, the party seeking a change of custody must first establish proper cause or change of circumstances by a preponderance of evidence. *Vodvarka*, 259 Mich App at 508-509. The movant must make this requisite showing before the trial court determines the burden of persuasion to be applied and conducts the evidentiary hearing. *Id.* at 509.

In determining the applicable burden of persuasion, the court must first determine whom the custody dispute is between. If the dispute is between the parents, the presumption in favor of the established custodial environment applies.[19] MCL 722.27(1)(c) embodies this presumption and provides:

(1) If a child custody dispute has been submitted to the circuit court as an original action under this act or has arisen incidentally from another action in the circuit court

[19] Alternatively, if the dispute is between a parent and a third party or agency, then the parental presumption embodied in MCL 722.25(1) applies and "trumps" the established custodial environment presumption. *In re Anjoski*, 283 Mich App at 54. In such instances, not relevant here, it is not necessary for the trial court to make findings with respect to the existence of an established custodial environment.

or an order or judgment of the circuit court, for the best interests of the child the court may do 1 or more of the following:

* * *

(c) Modify or amend its previous judgments or orders for proper cause shown or because of change of circumstances until the child reaches 18 years of age and, subject to section 5b of the support and parenting time enforcement act, 1982 PA 295, MCL 552.605b, until the child reaches 19 years and 6 months of age. The court shall not modify or amend its previous judgments or orders or issue a new order so as to change the established custodial environment of a child unless there is presented clear and convincing evidence that it is in the best interest of the child.

As a threshold matter to determining which party will carry the burden of rebutting the presumption by clear and convincing evidence, the court is required to look into the circumstances of the case and determine whether an established custodial environment exists. See *Bowers v Bowers*, 190 Mich App 51, 53-54; 475 NW2d 394 (1991). A child's custodial environment is established "if over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort." MCL 722.27(1)(c). In making this determination, a court must also consider the "age of the child, the physical environment, and the inclination of the custodian and the child as to permanency of the relationship . . . ." *Id.* If an established custodial environment exists with one parent and not the other, then the noncustodial parent bears the burden of persuasion and must show by clear and convincing evidence that a change in the custodial environment is in the child's best interests. *Berger*, 277 Mich App at 710. We note that in circumstances in which an established custodial

environment exists with both parents, see *Foskett*, 247 Mich App at 8, the party seeking to modify the custody arrangement bears the burden of rebutting the presumption in favor of the custodial environment established with the other parent.

Once the court has determined the applicable burden, it must next determine whether a change in the established custodial environment is in the child's best interests. This analysis involves a consideration of the best interests factors enumerated in MCL 722.23, which are:

(a) The love, affection, and other emotional ties existing between the parties involved and the child.

(b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any.

(c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.

(d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.

(e) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(f) The moral fitness of the parties involved.

(g) The mental and physical health of the parties involved.

(h) The home, school, and community record of the child.

(i) The reasonable preference of the child, if the court considers the child to be of sufficient age to express preference.

(j) The willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents.

(k) Domestic violence, regardless of whether the violence was directed against or witnessed by the child.

(*l*) Any other factor considered by the court to be relevant to a particular child custody dispute.

### 2. APPLICATION

In the present matter, the trial court, at petitioner's request, first addressed Reid's motion for custody. We find no fault with the court's decision to first consider Reid's motion. After hearing the parties' arguments, however, the trial court, without making any of the required findings, simply stated: "Okay. After considering the motion the Court's going to grant joint legal custody to mother and father and sole physical custody to Mr. Reid . . . ." We cannot condone this conclusory award of custody and the manner in which the court reached its decision, as it was plainly inconsistent with the procedural requirements of the act.

### *i.* THRESHOLD DETERMINATIONS

First, consistently with the CCA, the trial court should have first determined whether Reid had shown by a preponderance of evidence proper cause or change of circumstances. Clearly a change of circumstances had occurred since the entry of the order of custody entered by Judge Lombard in the paternity action: the minor child was removed from Johnson's care and custody in December 2006 and subsequently started living with Reid in January 2008. Reid was considered to have completed his treatment program as of May 12, 2008, while Johnson was

then unable to independently undertake the care and custody of the children without state oversight.

Next, because Reid met the requisite showing, the court should have articulated on the record the applicable burden of persuasion. As discussed earlier, this determination requires a consideration of both whom the dispute is between and, if it is between the parents, whether an established custodial environment exists with either party. The trial court, however, did not make any findings with respect to the existence of an established custodial environment, nor did it articulate the applicable burden of persuasion. Here, because the dispute is between the parents, the presumption in favor of the established custodial environment applies. MCL 722.27(1)(c).

To determine which party bears the burden of rebutting the presumption, the trial court should have considered whether an established custodial environment existed with either Reid or Johnson. Again, the court made no such finding. However, when there is sufficient information in the record on this issue, we make our own determination of this issue by de novo review. *Jack v Jack*, 239 Mich App 668, 670; 610 NW2d 231 (2000). The minor child has resided with Reid since January 2008 and has enjoyed parenting time with Reid since December 2006. Before the child began residing with Reid, the child indicated a desire to reside with Reid, and Reid's complete compliance with his treatment plan indicates a desire on Reid's part to make his relationship with the minor child permanent. Further, petitioner had consistently reported that the parenting time had been going well and that the child looked to Reid for "guidance, discipline, the necessities of life, and parental comfort." MCL 722.27(1)(c). Reid also resided in his own home, which petitioner deemed appropriate

for the child's needs. In our view, these facts were sufficient to establish the existence of an established custodial environment. As a result, Johnson had the burden of showing by clear and convincing evidence that a change in the established custodial environment was in the child's best interests.

### ii. BEST INTERESTS FACTORS

This inquiry necessarily requires that a trial court consider the best interests factors delineated in MCL 722.23. Johnson argues that the court's failure to do so constitutes error requiring a remand. We agree that the trial court erred and agree that a remand is necessary.

With respect to the best interests factors,

> the finder of fact must state his or her factual findings and conclusions under each best interest factor. These findings and conclusions need not include consideration of every piece of evidence entered and argument raised by the parties. However, the record must be sufficient for this Court to determine whether the evidence clearly preponderates against the trial court's findings. [*MacIntyre v MacIntyre (On Remand)*, 267 Mich App 449, 452; 705 NW2d 144 (2005) (citations omitted).]

"Where a trial court fails to consider custody issues in accordance with the mandates set forth in MCL 722.23 and make reviewable findings of fact, the proper remedy is to remand for a new child custody hearing." *Rittershaus v Rittershaus*, 273 Mich App 462, 475; 730 NW2d 262 (2007) (citations and quotation marks omitted). The scope of such a hearing is within the discretion of the trial court on remand, but it must consider all the evidence and information currently before it.

Here the trial court was faced with a fit father, an unfit mother, and the DHS. Because Reid had become a fit parent, the compelling circumstances justifying pe-

titioner's initial interference in the minor child's life no longer existed and the state no longer had any interest or right to intervene in Reid and B.J.'s enjoyment of their parent-child relationship, in which they both have a fundamental liberty interest. See *DeRose*, 469 Mich at 328-329; *In re Clausen*, 442 Mich at 686; *In re Anjoski*; 283 Mich App at 54; *Ryan*, 260 Mich App at 333. We note that this fundamental interest of a parent in the care and custody of his or her child extends to noncustodial parents, like Reid, as "[t]here is no reason to conclude that a parent has a diminished constitutional right to his child merely because he does not have physical custody of that child." *In re Rood*, 483 Mich 73, 121; 763 NW2d 587(2009) (opinion by Corrigan, J.). It follows that the state "may not enter into agreements with an unfit custodial parent that may compromise the state's efforts to reunite the child with the noncustodial parent." *Id.* at 86 n 11. While it may appear that the competing and remaining interests of Reid and Johnson, a fit and an unfit parent, are easily resolved when considered in conjunction with the child's fundamental liberty interest—it is undoubtedly in the child's best interests to be in the care and control of the fit parent—we cannot condone a conclusory award of custody, as was done in this case, given the nature of the parents' rights involved. In any matter involving a change of custody, there must be reviewable indicia on the record showing that the court satisfied itself concerning the best interests of the child. It is simply not enough to grant a change of custody motion without making any findings of fact and merely sign an order. The trial court should have, at a minimum, taken judicial notice of the confidential and legal file, taken any relevant testimony if necessary, given its findings on the best interests factors of the CCA, and subsequently made its custody determination in the paternity action.

Because the trial court failed to make any findings, we are prevented from determining whether the underpinnings of the ultimate determination are against the great weight of the evidence. We note that this is not for a lack of a sufficient evidentiary record. The record contains a plethora of information, compiled during the ongoing juvenile proceedings since 2006, on which the court could have based its determination, including numerous psychological evaluations and court reports regarding the parties' progress, as well as the testimony of the parties involved. But the trial court failed to refer to any of this information in support of its custody determination. Thus, in the absence of a reviewable determination, we must remand for the trial court to articulate factual findings consistent with the requirements of the CCA and conduct a new evidentiary hearing as necessary to make its ultimate custody determination.

## V. CONCLUSION

To conclude, our ruling in this case should be understood as clarifying the responsibilities of family division courts exercising jurisdiction under MCL 600.1021 and presiding over multiple matters controlled by different statutory schemes affecting a minor child. If a court presiding over a juvenile proceeding finds itself in a position in which the matter before it has been consolidated with a related custody matter, it must make clear that it is exercising jurisdiction pursuant to chapter 10 of the RJA. Conversely, if a court presiding over a domestic relations matter finds itself in a position in which the matter before it has been consolidated with a juvenile matter, it must also make clear that it is exercising jurisdiction under chapter 10 of the RJA. It is equally important that the court's exercise of jurisdic-

tion be consistent with relevant local court rules. Once a court has made clear its jurisdictional authority, it must be cognizant of which statutory scheme it is applying and must be mindful to put an indication on the record that accurately reflects what is being done and how it is being accomplished. To this end, it is self-evident that family division courts considering consolidated matters must abide by the procedures delineated in the statutory schemes affecting the parties.

In such instances, when one of the matters is a custody dispute, the court making the custody decision must make the requisite threshold determinations and then support its ultimate determination on the record by considering and making findings with respect to the best interests factors. While it was not necessary for the trial court to undertake a lengthy and intensive examination of the best interests factors under the unique circumstances of this case, we caution lower courts finding themselves in a similar procedural posture that there must be some indicia on the record showing that the court has satisfied itself that its determination is in the child's best interests. *Harvey*, 470 Mich at 192-193. We cannot stress the importance of this imperative enough. This requirement is necessary not only for preserving an adequate record for appellate review, see *People v Petty*, 469 Mich 108, 117-118; 665 NW2d 443 (2003), but is also essential for the protection of the fundamental rights of the parties involved. Because the trial court here did not abide by this requirement, a remand is necessary.

Remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.