*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* JOHNSON/CLEMENTS, Minors.

UNPUBLISHED
February 11, 2020

No. 348958
Genesee Circuit Court
Family Division
LC No. 18-135503-NA

Before: BOONSTRA, P.J., and TUKEL and LETICA, JJ.

PER CURIAM.

Petitioner, the Department of Health and Human Services (DHHS), appeals by right the trial court's order dismissing its petition for the court to take jurisdiction over respondents' minor children. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Respondents are the mother and father of 6 minor children, one of whom, MC, died in their care at four months of age. On October 23, 2018, Michael Zelinski, a Mt. Morris Township Police Officer, was dispatched to respondent's home after an emergency call from respondents reporting that MC was not breathing. Officer Zelinksi found respondent-mother in a bedroom attempting to perform CPR on MC. Officer Zelinski testified at the adjudication hearing that the bed was covered with clothing, bedding material, and random items, and that a crib in the room was full of various items, including a liquor bottle, some wire, cigarette ash, a box of crackers, an empty water bottle, a soiled diaper, a plastic bag, an empty petroleum jelly bottle, and a broken cell phone. Respondent-mother told Officer Zelinski that she was in a panic after finding MC and had been throwing items around the room while trying to help him. MC was taken to McLaren hospital and died the following day. Respondent-mother told a Child Protective Services (CPS) investigator that she had placed MC and his twin brother AC face up on a pillow on an adult bed while cleaning. At the preliminary hearing, the trial court authorized the petition but dismissed petitioner's claim for the immediate termination of respondents' parental rights. Respondents had entered into a voluntary safety plan with CPS, under which the three younger children remained in the home under the direct supervision of the maternal grandmother and the two older children were placed with their paternal grandfather. The trial court did not order the removal of any of the children.

-1-

A two-day adjudication trial was held in April 2019. CPS employees testified at the trial that respondents had been the subject of three previous CPS investigations[1] that had not resulted in a petition for court supervision. During these investigations, CPS employees noted a lack of "safe-sleeping" practices for infants, and instructed respondents that any child under the age of 12 months had to be placed alone in an empty bassinet, crib or "Pac'n Play" with a firm surface and tight-fitted sheets. Respondents ultimately signed three "safe-sleep agreements" between 2015 and 2017, indicating that they understood the need to follow this protocol.

A CPS investigator, Caroline Ostrander, testified that she visited respondent's home on the day MC was taken to the hospital, and that respondent-mother had told her that she had placed AC and MC on respondents' bed and had sat on the bed while folding laundry; respondent-father was also on the bed watching TV. AC's grandmother later came and took AC off the bed because he was fussing. Respondent-mother told Ostrander that respondents dozed off and that she awoke to find MC in the same position, on his back, but not breathing. Ostrander testified that when she received the initial call to investigate respondents after MC's death, she was advised that respondents' home was in a deplorable state; however, she stated that after her investigation she "didn't think that the home was deplorable at all." Yet Ostrander believed that there was a risk of harm to AC due to respondents' failure to follow safe-sleep protocols, and had respondents sign yet another safe-sleep agreement. Ostrander made home visits in December 2018 and January 2019 and found no issues with the home environment or the children.

Brian Hunter, M.D., the Genesee County Medical Examiner, testified that he performed an autopsy on MC, had found nothing out of the ordinary after the examination,[2] and had ruled that the cause of death was "undetermined in the setting of unsafe sleep." Dr. Hunter further testified:

> [W]hen we have a death like this, where we really don't have concrete evidence that -- of the position that the child was found in when he or she is found unresponsive and we don't have documented evidence of overlaying, the cause of

---

[1] The investigation in 2015 was for suspected physical abuse based on respondent-mother having slapped one of the children. This investigation was substantiated and respondent-mother was charged with domestic violence; however, the investigation found no pattern of ongoing abuse and CPS opted to provide respondents with in-home services rather than file a petition for removal. In 2017, another investigation for suspected child abuse based on respondents' oldest child being absent from school was unsubstantiated. Also in 2017, MC and AC tested positive for THC (the active ingredient in marijuana) at birth. This investigation was opened and closed the same day. All three of the investigations involved home visits that found no other issues, apart from the fact that safe sleep protocols were not being followed.

[2] Dr. Hunter did testify on cross-examination that he had discovered the presence of bacteria related to bronchial pneumonia and that MC was "positive for human rhinovirus and enterovirus," which Dr. Hunter described as "the virus that causes a cold." However, Dr. Hunter could not state with certainty that these findings indicated that MC had either pneumonia or a cold while he was alive, as they could have been caused by postmortem contamination.

death is listed as undetermined; and, as long as there's no other injury or natural disease, the cause of death is listed as undetermined but we note in the setting of unsafe sleep; so that we're still tracking these cases epidemiologically so we're looking at how many kids are dying in these unsafe sleep environments. . . . [T]here were unsafe sleep practices being followed; and the implications of those unsafe sleep practices, I can't say definitively that someone overlaid the child or someone's face was buried -- your know, the child's face was buried in a pillow. We note the presence of unsafe sleep because epidemiologically we need to track those cases where children are dying [of] unsafe sleep, otherwise you'll never be able to speak later on throughout time about what's the incidents [sic] of unsafe sleep practices in the community.

Brian Nolan, M.D., a board-certified doctor in child pediatrics, pediatric critical care, and the treatment of child abuse, testified as petitioner's expert and opined that MC had been deprived of oxygen, leading to his death. Dr. Nolan indicated that he had reviewed MC's records and had found no disease or defect that would account for MC having suffered from lack of oxygen or cardiac arrest, and that MC appeared to have been well cared-for. Dr. Nolan stated that he would be "concerned" if MC had been sleeping in a bed between sleeping parents. Dr. Nolan opined that MC's cause of death was likely "positional asphyxia," caused by unsafe sleeping practices, although he could not state so definitively. On cross-examination, Dr. Nolan admitted that MC's medical records stated that there was a "concern for SIDS [Sudden Infant Death Syndrome]." When asked about this statement, Dr. Nolan stated generally that infant deaths from SIDS were much rarer than doctors had believed in the past, and that many SIDS deaths were actually deaths from other causes, such as unsafe sleep. However, he admitted that deaths from SIDS still occurred and were still a concern.

During its closing argument, petitioner argued that the court should take jurisdiction because of respondents' improper supervision, so that it could be verified that respondents were practicing safe-sleep practices. The children's lawyer-guardian ad litem (L-GAL) argued that it was unnecessary for the court to take jurisdiction over the children, noting that the children were currently doing well and that MC's cause of death was inconclusive.

The trial court declined to take jurisdiction over the children, stating:

[T]he court has enough experience in cases like this that it could fashion a rational basis for going either way. . . . It could be argued that had the baby not been in that bed, we wouldn't be here. . . [T]he bottom line is the other kids in the house have been well cared for. We're quickly approaching that one year birth date; and certainly the historic incidents and these proceedings can be about as much of a learning, an educational component—and you talk about learning the hard way, this certainly is it—but the case is in the margins; and, moreover, the benefit of finding jurisdiction and ordering services in not readily apparent . . . based on what's been presented in court, um, I don't know if you're talking about smoking guns, I -- I don't see it. . . . But I'm not going to find jurisdiction. I don't believe it's in the -- in the children's best interests. I don't think compounding a tragedy with further court or agency intervention is appropriate. I would implore the parents to do anything other than end up sleeping in the same bed with the kids . . . .

The trial court issued an order declining to take jurisdiction over the children. The order was a Supreme Court Administrative Office (SCAO) form order, and it reflected a check in the box that stated, "[a]fter trial, and by clear and convincing evidence, there are no statutory grounds to exercise jurisdiction over the children."

This appeal followed.

## II. STANDARD OF REVIEW

Generally, the applicable evidentiary standard applied by a trial court presents a question of law that this Court reviews de novo. *Pierron v Pierron*, 282 Mich App 222, 243; 765 NW2d 345, 361 (2009); *In re AMAC*, 269 Mich App 533, 536; 711 NW2d 426 (2006). However, because the issue of the evidentiary standard applied in this case was never raised before, discussed, or decided by the trial court, we review this unpreserved issue for plain error. See *Demski v Petlick*, 309 Mich App 404, 426; 873 NW2d 404 (2015). This Court reviews for clear error the trial court's decision whether to exercise jurisdiction. *In re BZ*, 264 Mich App 286, 295; 690 NW2d 505, 510 (2004). Clear error exists "if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *Id.* at 296-297. To be clearly erroneous, a decision must be more than maybe or probably wrong. *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286, 296 (2009).

## III. EVIDENTIARY STANDARD APPLIED BY THE TRIAL COURT

Petitioner argues that the trial court mistakenly applied the clear and convincing evidence standard of proof to petitioners' request to take jurisdiction, rather than the preponderance of the evidence standard. We disagree.

A court may assume jurisdiction over a child if the evidence supports allegations of wrongdoing that meet the requirements of MCL 712A.2(b)(1) and (2). For the trial court to do so, the petitioner must prove by a preponderance of the evidence one or more of the statutory grounds for jurisdiction alleged in the petition. See MCR 3.972(C)(1); *In re Sanders,* 495 Mich 394, 405; 852 NW2d 524, 529-530(2014).

Here, the trial court did not expressly state at the adjudication trial which standard of proof it was applying, but in the order declining to exercise jurisdiction, it checked the box for "clear and convincing evidence." Yet the trial court stated on the record that it "could fashion a rational basis for going either way" and that "the case is in the margins," which to us seems more consistence with the application of a preponderance standard.

"A trial judge is presumed to know the law." *Demski*, 309 Mich App at 427. Although the trial court did not announce which evidentiary standard it was applying, there is no evidence in the record, apart from a single checked box on a SCAO form order, that it applied an incorrect one. We decline to find plain error under these circumstances. *Demski*, 309 Mich App at 426; see also MCR 2.613(A).

Petitioner also argues that the trial court improperly engaged in a best-interest determination before determining whether it had jurisdiction. We disagree that petitioner has

accurately characterized what the trial court said. The trial court merely stated, after holding that it would not be asserting its jurisdiction, that it was not in the children's "best interest" for it to do so; it did not conduct a best-interest analysis. In context, it appears that trial court was expressing its belief that its decision was the correct one for the welfare of the children and the family before it; we disagree with petitioner that the trial court's decision was based on an improper best-interest analysis rather than the evidence before it and the applicable law.

## IV. ADJUDICATION DECISION

Petitioner also argues that the trial court erred by declining to take jurisdiction over the children. We disagree.

A child comes under a trial court's jurisdiction and becomes a ward of the court when the trial court finds by a preponderance of the evidence that there is factual support to exercise jurisdiction under MCL 712A.2(b). See MCR 3.972(E); MCR 3.977(E)(2); *In re AP*, 283 Mich App 574, 593; 770 NW2d 403, 413 (2009). MCL 712A.2(b) provides in relevant part:

> (b) Jurisdiction in proceedings concerning a juvenile under 18 years of age found within the county:
>
> (1) Whose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship. . . .
>
> (2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in. . . .

MCL 333.5885 requires hospitals and health professionals to advise parents of infant safe-sleep practices. MCL 333.5887 requires petitioner to work with other organizations to inform parents of infant safe-sleep practices and the risk of infant death from unsafe sleep, and to provide educational and instructional materials on this issue. Here, it is undisputed that CPS had educated respondents on safe-sleep practices during three previous investigations in 2015 and 2017 and that respondents had failed to follow those practices regularly. Further, it is undisputed that MC ceased breathing while he was placed on respondent's adult bed with bedding and pillows. However, Dr. Hunter did not determine that the cause of death was unsafe sleep practices; rather, he only concluded that the death was "undetermined in the setting of unsafe sleep." Dr. Hunter's further statements clarified that the reference to unsafe sleep was part of a larger-scale collection of epidemiological data, not a statement regarding causation in this particular case. Dr. Nolan, petitioner's expert, opined that it was "likely" that MC died of positional asphyxia based on his review of the medical records, but could not definitively state that unsafe sleep practices were the cause of MC's death. MC's medical records stated a concern for SIDS and positive tests for pneumonia and the cold virus, although Drs. Nolan and Hunter, respectively, offered alternative explanations for those factors.

We agree with the trial court that there was evidence presented in support of both petitioner's and respondent's positions. There was evidence that MC's death was caused by positional asphyxia, but also that MC's cause of death could not be determined. Moreover, MC did not die in his regular sleep environment, but expired after his parents fell asleep briefly with him on their bed. While Ostrander and Officer Zelinski testified that they saw a crib full of inappropriate items in respondents' bedroom, it was never established that any child used the crib to sleep. And even if MC did die of positional asphyxia, Ostrander's testimony from subsequent home visits indicated no problems with the rest of the children's sleeping environments, or that the children were at risk of harm or neglect in any other way.

Under the circumstances of this case, we may have found no error if the trial court had decided to exercise jurisdiction over the children. However, we reiterate that a finding of clear error requires more than a finding that the trial court might have been wrong. *Williams*, 286 Mich App at 271. And we are not left with a definite and firm conviction, giving due regard to the trial court's special opportunity to observe the witnesses, that the trial court made a mistake by declining to exercise jurisdiction. *In re BZ*, 264 Mich App at 295. The trial court was not tasked with determining whether MC's death was definitely caused by positional asphyxia; rather, it was tasked with determining whether the remaining children were at risk of harm such that it should take jurisdiction over them. It heard evidence that the younger children (including AC, the only child young enough to also be at risk from the unsafe sleep practices at issue in this case) were doing well at home and that Ostrander had no current concerns for the children's safety. Additionally, the children's L-GAL recommended against the court's exercise of jurisdiction, noting that the cause of death was inconclusive and that no criminal charges had been filed against respondents. The L-GAL also stated that he was unsure what services would be offered if the court did exercise jurisdiction other than to "look in there and make sure nobody's sleeping with the baby." Finally, petitioner's argument that the court should take jurisdiction was based on its stated desire to ensure that respondents were following safe-sleep protocols; petitioner did not allege that the children were at risk of any other type of harm or neglect.[3] Under the facts of this case, we do not find clear error in the trial court's adjudication decision and decline to reverse it. *In re BZ*, 264 Mich App at 295.

Affirmed.

/s/ Mark T. Boonstra
/s/ Jonathan Tukel

---

[3] Although not raised by either party, we note that by this point AC has aged beyond the period of risk for unsafe sleep death at issue in this case. Although we do not decide the issue on this basis, it does raise the question of whether, even if we agreed with petitioner, any relief we could grant would be moot. *Garrett v Washington*, 314 Mich App 436, 449; 886 NW2d 762 (2016) ("[a] matter is moot if this Court's ruling cannot for any reason have a practical legal effect on the existing controversy.") (quotation marks and citation omitted).