*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* R. D. RICE, Minor.

UNPUBLISHED
July 09, 2025
9:51 AM

No. 374161
Iosco Circuit Court
Family Division
LC No. 22-000852-NA

Before: O'BRIEN, P.J., and M. J. KELLY and KOROBKIN, JJ.

PER CURIAM.

Respondent appeals as of right the trial court's order terminating his parental rights to the minor child, RDR, pursuant to MCL 712A.19b(3)(b)(*i*) (parent's act caused abuse or injury), (c)(*i*) (conditions that led to adjudication continue to exist), and (c)(*ii*) (failure to rectify other conditions). We affirm.

## I. BACKGROUND

The Department of Health and Human Services (DHHS) filed a petition to take jurisdiction over RDR on July 29, 2022. Children's Protective Services (CPS) received a referral alleging that the biological mother and respondent had neglected RDR. The petition alleged that the biological mother[1] and her partner were abusing substances. The petition further alleged that respondent lived in Ohio, was behind on his court-ordered child support payments, and had not petitioned the court for visitation with RDR. Both respondent and the biological mother had a history of substance abuse and CPS involvement, as CPS substantiated allegations in five previous investigations. For instance, the petition alleged that in 2019, CPS removed RDR from the care of respondent and the biological mother due to improper supervision, domestic violence between respondent and the biological mother in RDR's presence, and substance abuse. Also, the petition alleged that in 2014, a Texas circuit court removed respondent's two other children due to

---

[1] The biological mother was also a respondent in this case until her death during the pendency of the case.

substance abuse, domestic violence, a neglectful home environment, and physical abuse, and that respondent did not comply with or complete his recommended case services. Finally, the petition alleged that respondent had a criminal history in Michigan and Texas, including convictions for family violence, domestic violence, and assault.

At a preliminary hearing on August 8, 2022, the trial court took jurisdiction over RDR but released him to the biological mother under the DHHS's supervision while she was offered services.[2] CPS informed the trial court that there was a custody order in place through the Alcona County Friend of the Court (FOC), entered on August 12, 2021, that awarded the biological mother sole legal and sole physical custody of RDR and held respondent's parenting time with RDR in abeyance until further order of the court. The FOC order also held respondent's child support in abeyance. The FOC order was put in place due to a domestic violence incident between respondent and the biological mother in RDR's presence. The trial court ordered respondent to address the FOC order with the Alcona Circuit Court throughout the proceedings, but he failed to do so.

On August 29, 2022, the DHHS amended its petition to request that the trial court remove RDR from the biological mother's care due to her continued substance abuse and domestic violence. CPS received a complaint regarding domestic violence between the biological mother and respondent that occurred on the same date of the amended petition. RDR was present when respondent assaulted the biological mother, and RDR was injured as a result. Respondent was arrested for domestic violence and child abuse following the altercation. Because of the assault, respondent had a no-contact order in place prohibiting him from contacting the victims of the assault as a condition of his bond. Respondent was later incarcerated due to the assault.

On June 3, 2024, the DHHS filed a supplemental petition to terminate respondent's parental rights to RDR. The DHHS alleged that respondent failed to rectify the issues addressed by his case service plan, namely his parenting skills, anger management, domestic violence, emotional stability, and substance abuse. Respondent refused to participate in services throughout a majority of the proceedings. During his incarceration, respondent denied having any issues with domestic violence, emotional stability, or substance abuse. Before and after his incarceration, respondent lived in Ohio and prioritized his work. Respondent repeatedly told the court, as well as the DHHS, that his work prevented him from participating in services. At the termination hearing in August 2024, respondent acknowledged that he did not engage in services until late in the proceedings because he wanted to earn money and because he believed the proceedings would resolve themselves. Following the termination hearing, the trial court issued an opinion and order on September 25, 2024, terminating respondent's parental rights.

Respondent now appeals as of right.

---

[2] The trial court also took jurisdiction over the biological mother's other child, who lived in the home with RDR, the biological mother, and the biological mother's partner when the DHHS filed its petition for jurisdiction.

## II. ANALYSIS

## A. REASONABLE EFFORTS

Respondent first argues that the DHHS failed to make reasonable efforts toward his reunification with RDR because the DHHS did not provide respondent with parenting time due to the FOC order and the DHHS did not help respondent address his barriers to reunification, warranting reversal. We disagree.

Generally, the issue of whether petitioner made reasonable efforts to preserve and reunify the family is reviewed for clear error. See *In re Fried*, 266 Mich App 535, 542-543; 702 NW2d 192 (2005). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App, 286, 296-297; 690 NW2d 505 (2004).

The DHHS has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights. *In re Hicks/Brown*, 500 Mich 79, 85; 893 NW2d 637 (2017); MCL 712A.18f(3)(b) and (c); MCL 712A.19a(2). Our Supreme Court has explained that " '[r]easonable efforts to reunify the child and the family must be made in *all* cases' except those involving aggravated circumstances . . . ." *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010), quoting MCL 712A.19a(2). Reasonable efforts begin with the creation of a case service plan aimed at rectifying the conditions that caused the child's removal. *In re Fried*, 266 Mich App at 542. Thereafter, "[w]hile [the DHHS] has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of [the respondent] to participate in the services that are offered" and "demonstrate that [he or she] sufficiently benefited from the services provided." *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012).

Respondent argues that the DHHS failed to make reasonable efforts toward reunification because it improperly relied on the FOC order to deny respondent parenting time when it could have moved the trial court to enter an order that superseded the FOC order. MCR 3.205(A) provides:

> If an order or judgment has provided for continuing jurisdiction of a minor and proceedings are commenced in another Michigan court having separate jurisdictional grounds for an action affecting that minor, a waiver or transfer of jurisdiction is not required for the full and valid exercise of jurisdiction by the subsequent court.

Where a juvenile court assumes jurisdiction over a child and the child becomes a court ward under the juvenile code, the juvenile court's orders supersede all previous custody orders, even if inconsistent or contradictory, while the juvenile matter is pending. *In re AP*, 283 Mich App 574, 594; 770 NW2d 403 (2009). This Court has explained:

> "[U]pon entry of a child custody order under the [Child Custody Act (CCA)], a child's parents, or other custodians, must abide by the terms of the custody order.

However, once a juvenile court assumes jurisdiction over a child and the child becomes a ward of the court under the juvenile code, the juvenile court's orders supersede all previous orders, including custody orders entered by another court, even if inconsistent or contradictory. In other words, the previous custody orders affecting the minor become dormant, in a metaphoric sense, during the pendency of the juvenile proceedings, but when the juvenile court dismisses its jurisdiction over the child, all those previous custody orders continue to remain in full force and effect. . . . [T]he juvenile court's orders function to supersede, rather than modify or terminate, the custody orders while the juvenile matter is pending because the juvenile orders are entered pursuant to a distinct statutory scheme that takes precedence over the CCA. We note that during the duration of the juvenile proceedings, while the parties subject to the custody order can move to modify the custody order, any modification would remain superseded by the juvenile court's orders." *Id*. at 593-594 (internal citations omitted).

While this caselaw supports respondent's argument that any order from the trial court would have superseded any custody order from the Alcona Circuit Court, respondent's argument is misplaced. First, just because the trial court could have entered an order that superseded other orders does not mean that the court was required to do so. Next, while the court initially ordered respondent to address the FOC order in the preliminary proceedings, respondent was arrested approximately three weeks later for assaulting the biological mother in an incident that injured the biological mother and RDR. The trial court noted that respondent, instead of resolving the FOC order, tried to remove RDR from the biological mother's care and ultimately assaulted her and harmed RDR. As a result of this incident, respondent had a no-contact order through the Iosco Circuit Court, preventing him from having any contact with the victims before his incarceration. While the trial court later left respondent's parenting time to the DHHS's discretion, the DHHS explained that it did not offer respondent regular parenting time with RDR because of the assault, the no-contact order, and the FOC order. The FOC order was put in place to resolve an abuse-and-neglect case in Alcona County involving respondent and the biological mother engaging in domestic violence in RDR's presence, which rightly concerned the trial court and the DHHS given that respondent again engaged in domestic violence with the biological mother after the FOC order was entered.

Once respondent was released from jail, respondent's caseworkers informed him that he would not have visitation with RDR until he participated in services, but respondent still refused to participate in services until five months before the termination hearing. Ultimately, the DHHS allowed respondent to have supervised visits with RDR after he began participating in services. Accordingly, respondent's argument, that the DHHS's reliance on the FOC order prevented him from having contact with RDR throughout the proceedings overlooks his own actions and refusal to participate in services and is without merit.

Respondent also argues that the DHHS failed to make reasonable efforts toward reunification because it failed to provide him with services to address his barriers to reunification throughout the proceedings. To successfully claim a lack of reasonable efforts, a respondent must establish that he or she would have fared better if the petitioner offered other services. *In re Fried*, 266 Mich App at 543. Respondent argues that his bond with RDR would have been stronger if the DHHS had allowed regular visits. As discussed, however, the DHHS was concerned with

respondent's history of domestic violence, and he had a no-contact order that had not been resolved. Further, the record reflects that respondent was presented with a case-service plan that provided, among other services, parenting-skills materials, online parenting classes, anger management counseling, and avenues to remain in contact with RDR that he refused to participate in until five months before the termination hearing. Respondent stated that he could not participate in the services in part because he worked 14-hour shifts and was unwilling to find other employment to prioritize rectifying his barriers to reunification. However, respondent was offered services that he could have completed in conjunction with his work schedule.

Because the record does not reflect that the DHHS failed to make reasonable efforts to reunite respondent with RDR in light of his domestic violence, his priorities throughout the proceedings, and his lack of participation in services, the trial court did not clearly err.

## B. STATUTORY GROUNDS

Next, respondent argues that the trial court clearly erred when it found that statutory grounds existed to terminate respondent's parental rights. We disagree.

The trial court terminated respondent's rights under MCL 712A.19b(3)(b)(*i*), 712A.19b(3)(c)(*i*), and 712A.19b(3)(c)(*ii*). "In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re Jackisch/Stamm-Jackisch*, 340 Mich App 326, 333; 985 NW2d 912 (2022) (quotation marks and citation omitted). We review for clear error the trial court's factual findings and findings that a ground for termination was established. MCR 3.977(K); *In re White*, 303 Mich App 701, 709; 846 NW2d 61 (2014). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App at 296-297.

To terminate parental rights pursuant to MCL 712A.19b(3)(b)(*i*), a trial court must find that the child suffered a physical injury because of the parent's actions and that there was a reasonable likelihood that the child would suffer from injury in the future if placed back in the parent's care. "[F]or [a] physical injury to fall within MCL 712A.19b(3), it must be caused by a 'parent's act' or a 'nonparent adult's act' and not merely contributed to by an unintentional omission." *In re LaFrance*, 306 Mich App 713, 725; 858 NW2d 143 (2014).

During the August 29, 2022 altercation, respondent's assault of the biological mother resulted in injury to RDR. Respondent entered the biological mother's home and refused to leave. When the biological mother tried to return to her home with RDR, respondent yelled at her, picked her up off the ground, and head-butted her. As the biological mother tried to get up, respondent head-butted her again, knocking her into RDR and into a table. The assault left the biological mother with black eyes and injuries to her nose and mouth, and it left RDR with a small injury to his shoulder. Because respondent assaulted the biological mother while she was in close proximity to RDR, RDR's injury resulted from respondent's act, not an unintentional omission.

While respondent argues that this incident was insufficient evidence to establish that RDR would be harmed if the court returned him to respondent's care, respondent overlooks his history

of domestic violence and his refusal to address his issues with domestic violence in the current proceedings. Sufficient evidence was presented in the trial court to establish that there was a reasonable likelihood that RDR would suffer injury in the foreseeable future if he were in respondent's care, and the trial court did not clearly err by finding that termination of respondent's rights was proper under MCL 712A.19b(3)(b)(*i*). Because the record contains sufficient evidence to support one statutory ground for termination, we need not consider whether the other grounds the trial court relied on also supported its decision. See *In re Foster*, 285 Mich App 630, 633; 776 NW2d 415 (2009).

## C. BEST INTERESTS

Finally, respondent argues that the trial court clearly erred in finding that termination was in RDR's best interests because respondent had a bond with RDR. We disagree.

This Court reviews for clear error a trial court's decision that termination is in a child's best interests. *In re Jackisch/Stamm-Jackisch*, 340 Mich App at 333. "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *Id*.

"Once a statutory basis for termination has been shown by clear and convincing evidence, the court must determine whether termination is in the child's best interests." *In re LaFrance*, 306 Mich App at 732-733, citing MCL 712A.19b(5). Whether termination is in the child's best interest must be established by a preponderance of the evidence. *Id.* at 733. The trial court should consider all of the evidence when determining whether it is in the child's best interests to terminate parental rights. *In re White*, 303 Mich App at 713. When determining if termination is in a child's best interests, the trial court may consider the bond between the child and the respondent, the respondent's parenting ability, the child's need for stability and permanency, and the advantages of the child's current placement. *In re Olive/Metts*, 297 Mich App 35, 42; 823 NW2d 144 (2012). The trial court may also consider any history of domestic violence, the respondent's compliance with their parent-agency agreement, the respondent's visitation history with the child, the child's well-being in their current placement, and the potential for adoption. *In re White*, 303 Mich App at 714. A best-interests analysis should focus on the child, not the respondent. *In re MJC*, ___ Mich App at ___; slip op at 9.

Even though respondent's parenting-time visits with RDR went well, they were limited. Respondent ignores the fact that he only had two supervised visits with RDR during the proceedings, and he only sent RDR three letters in two years. Respondent did not have any other contact with RDR, in part, because of the no-contact order. Respondent also did not meaningfully participate in the services that he was offered so that he could have more contact with RDR.

Moreover, while it was reported that respondent and RDR clearly loved each other and that RDR was excited to interact with respondent, the trial court was required to consider a wide variety of factors and weigh *all* of the available evidence. *In re White*, 303 Mich App at 713-714. The trial court was required to consider RDR's time in his foster placement, his need for permanence and stability, and his likelihood of adoption. Specifically, at the time of the termination hearing, RDR had been in his foster placement for approximately two years. RDR was seven years old at the time of the hearing, but he had spent more than four years of his life in foster placements

because of respondent's lack of progress in past and current proceedings. RDR was also in a foster placement with his half-brother, KF, during the proceedings, and the two were very closely bonded. Because KF's parents were deceased, RDR and KF's foster parents were in the process of adopting KF and were willing to adopt RDR as well. Given respondent's substance abuse, lack of parenting skills, history of domestic violence, emotional instability, RDR's time in foster care, RDR's need for permanence and stability, RDR's bond with KF, and respondent's lack of contact with RDR throughout the proceedings, the trial court did not clearly err by finding that it was in RDR's best interests to terminate respondent's parental rights.

## III. CONCLUSION

The DHHS provided respondent reasonable efforts through a wide variety of services to rectify his barriers to reunification. Respondent did not participate in those services, and the trial court was presented with sufficient evidence that established that RDR would be harmed if returned to respondent's care. Further, it was in the best interests of RDR for respondent's parental rights to be terminated because RDR needed permanency, stability, and the ability to remain close with KF; all of which were provided by RDR's foster parents.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Michael J. Kelly
/s/ Daniel S. Korobkin